Filed 5/14/14  In re A.M. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re A.M. et al., Persons Coming Under the Juvenile Court Law. | B248820 (Los Angeles County Super. Ct. No. CK64476) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> GUILLERMO P., <br><br> Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Rudolph A. Diaz, Judge.  Affirmed.

Joseph D. Mackenzie, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

————————————

A father, against whom no individual allegations were sustained, appeals from a juvenile court's dispositional order placing his children in his care, but requiring him to participate in individual counseling to address case-related issues. He maintains there is no evidence to support the order, which is unreasonable and not designed to eliminate the conditions which led to the assertion of dependency court jurisdiction over his children. We find no error, and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellant Guillermo P. (father) and Krystal M. (mother, who is not a party to this appeal) are the parents of minors A.M. (born April 2005), Isaiah P. (born April 2006) and Joey P. (born October 2012). This is father's second appeal in this case. In our opinion in the prior appeal, which involved only minors A.M. and Isaiah, we found that the juvenile court had "erred in asserting jurisdiction over father, and reverse[d] the dispositional order requiring him to participate in individual counseling." (*In re A.M.* (Sept. 28, 2012, B237622) [nonpub. opn.] at p. 2 (Opinion).)

Respondent Department of Children and Family Services (DCFS) filed a Welfare and Institutions Code section 300[1] petition in February 2011, after mother was involved in a car accident.[2] The petition alleged that mother had endangered A.M. and Isaiah by driving while intoxicated, in the wrong direction on the freeway with the children in the car, and that mother had a history of drug abuse. The petition further alleged that father had a history of substance abuse and endangered the children by failing to provide for them because he was incarcerated. (Opinion, pp. 2–3.) A subsequently sustained amended petition stated that father had an "'unresolved'" history of substance abuse and was incapable of providing

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] A 2006 dependency action terminated successfully after the parents entered into a voluntary family maintenance contract and agreed to participate in counseling and parenting programs. A family law order gave mother legal and physical custody of the children and granted father, who fully complied with the case plan prior to his incarceration, unmonitored visits after his release. (Opinion, pp. 2–4.)

2

regular care and supervision for A.M. and Isaiah, who had been declared juvenile court dependents in the past due to his substance abuse which endangered the children' health and safety, and placed them at risk of harm. (*Id.* at p. 4.) Meanwhile, the children were placed in the care of their paternal grandparents.

Father moved in with mother following his released from prison in late October 2011. He wanted to support her so she could finish her court-ordered programs and the family could reunify. Father submitted voluntarily to a random drug screen which was negative. He and mother began to visiting the children every day, and the visits were appropriate. (Opinion, p. 4.)

In connection with the November 2011 disposition hearing, DCFS opined that although father had not been ordered into a drug treatment program in the 2006 case, he might benefit from counseling to assist his reintegration back into society, and to address child development and separation issues, and lifestyle choices that led to his incarceration for robbery. DCFS also requested that father be required to submit to additional random drug tests. The children's counsel concurred, and also requested that father's visits be monitored until he had "'proved himself.'" (Opinion, p. 4.)

Father objected, arguing there was no evidence to justify requiring him to undergo counseling or more drug tests, and that the extant order from the 2006 case had given him unmonitored visits after his release from prison. (Opinion, pp. 5–6.) The juvenile court ordered father, among other things, to participate in individual counseling. (*Id.* at p. 4.) Father appealed from the juvenile court's jurisdictional findings and dispositional order as to him. We found the court had erred in asserting jurisdiction over father, and reversed the dispositional order requiring him to participate in individual counseling. (*Id.* at p. 2.)

While the appeal was pending, father and mother, pregnant again, lived with the maternal grandparents. Mother was participating in court-ordered counseling, drug testing and an outpatient program, and had completed a parenting program. Most of her drug tests were negative. Father also participated in individual counseling, and the therapist reported that he understood "the importance of child safety and responsibility and the physical and emotional well-being of his children," and his goals remained "in progress." Father helped

3

the children prepare for school in the morning and with their daily needs when they returned in the evening from daycare. Due to the on-call nature of his work, father only inconsistently participated in therapy.

A.M. and Isaiah continued to live with their paternal grandparents. DCFS liberalized visitation in March 2012, giving the parents unmonitored contact and, in May 2012, began overnight and weekend visits. There were no reports of inappropriate behavior, and both the paternal grandmother and the children told DCFS the children liked spending time with their parents. On June 1, 2012, the juvenile court terminated the suitable placement order, placed the children with mother and father and lifted a drug-testing order with respect to father, but ordered him to continue participating in individual counseling. In September 2012, DCFS reported both parents were complying with the case plan.

Joey was born in October 2012, and spent several weeks in the hospital. After he came home from the hospital, the family moved in with the paternal grandmother. In late November 2012, DCFS received a referral alleging emotional abuse. Apparently, the paternal grandmother became upset after mother locked a door while she was inside a room with Joey. The paternal grandmother told mother that it was her home, and mother had no right to lock the door. The women argued, and a "scuffle" ensued, which was witnessed by A.M. Paternal grandmother left with A.M. After father returned and learned what happened, he sided with the paternal grandmother, blaming mother for the altercation. Father and a maternal aunt then engaged in a "commotion," which was witnessed by Joey and Isaiah. Mother took the children to live with maternal grandmother. Father stayed at the paternal grandmother's house, but soon joined his family at the maternal grandmother's home.

Mother continued participating in individual counseling and had a negative drug test on October 23, 2012. However, mother failed to test on November 7 and 27, 2012. She claimed she did not know she was supposed to test on the first date, and could not test on the second because it was raining and she had no one to watch the children. DCFS reported that father had participated in seven counseling sessions between mid-May and mid-September

4

2012.  His attendance was inconsistent because of his work and Joey's birth.  The counselor terminated therapy due to father's inconsistent participation.

On January 9, 2013, DCFS filed a new section 300 petition as to Joey, and a section 387 petition as to A.M. and Isaiah.  The petitions alleged that mother had tested positive on December 26, 2012, for amphetamine and methamphetamine and was under the influence of those substances while the children were in her care.  DCFS also reported that in addition to the two missed tests in November 2012, mother missed a drug test on December 3, 2012.

Father and mother participated in a DCFS team decision meeting on January 4, 2013.  Mother denied any recent drug use.  Father, who had been staying with the paternal grandmother during the past few weeks, said he had not known mother was using drugs and agreed to submit to an on-demand test that day.  Father had to return to Las Vegas for work, but would be back by January 7, 2013.  He said the paternal grandparents would care for the children while he was gone, and he planned to remain at the paternal grandparents' home with the children.  The children remained released to father.

A detention hearing was conducted on January 9, 2013.  The children were detained as to mother, and remained released to father.  Mother was given monitored visitation.  The court dismissed the February 2012 petitions as to father.

In a February 19, 2013 jurisdiction/disposition report, DCFS reported that a social worker had met with A.M. and Isaiah on January 30, 2013.  A.M. said she knew what drugs were and had once seen a small bag with "something green inside" at someone else's house, that someone told her was drugs.  She denied seeing mother or father use drugs or having seen any drugs in the home.  A.M. could not recall at whose house she had seen the drugs.  Isaiah did not know what drugs were, but knew they were bad and mother and father did not do bad things.  Isaiah said that he went to sleep when his parents argued.  They did not do so often and never hit one another.  Father told DCFS he had never seen mother use drugs and did not know why she tested positive.  Nevertheless, he wanted to have an intervention to help her out and wanted her to get help so they could be together as a family.  He said that he and mother had argued on occasion between November and early January, after which he left

home and spent a couple of days with the paternal grandmother before returning to mother; this had not occurred often.

Father told DCFS he believed mother forgot she was supposed to test several times, due to Joey's hospitalization and the fact that she was overwhelmed. He planned to "help [mother] get the help that she needs so we could all be a family." When interviewed by DCFS regarding the allegations of the petitions, mother at first denied any drug use, but then admitted she had gone to a Christmas party on December 25, 2012, and relapsed. She said she had four beers and a shot of tequila, and believed someone put something in her drink. Mother denied using methamphetamine and did not know why she had tested positive for that drug. Mother conceded that she should not drink, and needed to stay sober. She knew about her "trigger" and was in an outpatient program. She told the social worker she wanted "to do everything to be back with [her] family."

DCFS recommended that the court order mother to participate in a case plan consisting of a substance abuse program with random drug and alcohol testing, and that father be ordered to participate in family maintenance services consisting of "individual counseling to address case issues" and AA/NA meetings.

At the jurisdictional/dispositional hearing on February 21, 2013, mother pleaded no contest and the court sustained the petitions. Proceeding to disposition, father's counsel referred to the prior appeal and this Court's reversal of the juvenile court's prior orders, noting that he was nonoffending. Father argued that DCFS had failed to make a sufficient showing as to why he should be required to participate in individual counseling or AA. The children's attorney believed it was appropriate for father to participate in counseling "to address co-dependency," particularly in light of the parents' plan to reconcile. County counsel, noting that he was new to the case and unfamiliar with the appellate proceedings, argued father would benefit from AA or NA. In response, father's counsel acknowledged the parents hoped to reconcile, but argued co-dependency was not an issue and that father was, by all accounts, doing a wonderful job caring for the children.

The juvenile court observed that the parents' plan to reconcile as a couple constituted a reason to require father to participate in individual counseling. It then declared Joey a

6

dependent, removed the children from mother's custody and maintained them in father's custody.  Mother was ordered to participate in a drug and alcohol program, with random drug testing and in individual counseling.  Father was ordered to participate in "[i]ndividual [c]ounseling to [a]ddress case issues to address co-dependency."  He appeals.

## DISCUSSION

The sole issue on appeal is whether the juvenile court erred when it ordered father to participate in individual counseling aimed at resolving "case issues to address co-dependency."  Father insists there is insufficient evidence to justify this order, which was unreasonable and not designed to eliminate the conditions that led to the finding that the children are persons described by sections 300 and 387.[3]  We disagree.

We review a juvenile court's disposition orders for substantial evidence.  (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654.)  To that end, "'[w]e review the record to determine whether there is any substantial evidence to support the juvenile court's conclusions, and we resolve all conflicts and make all reasonable inferences from the evidence to uphold the court's orders, if possible.  [Citation.]'"  (*In re Drake M*. (2012) 211 Cal.App.4th 754, 763.)  As appellant, father bears the burden of showing there is "no evidence of a sufficiently substantial" nature to support the order with which he takes issue.  (*In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 420; *In re Diamond H*. (2000) 82 Cal.App.4th 1127, 1135, disapproved on another point in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6.)

Further, in determining whether a child may be safely maintained in a parent's physical custody, the court may consider the parents' past conduct and current circumstances, and their responses to the conditions that gave rise to juvenile court intervention.  (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917–918.)  At the dispositional

---

[3] Father also asserts the order was made in error because the sustained allegations of the petitions do not pertain to him, but only to mother.  This is true, but irrelevant.  Once jurisdiction over a child is established, a juvenile court may make orders with respect to a nonoffending parent.  (See *In re I.A*. (2011) 201 Ca1.App.4th 1484, 1491–1492.)

7

hearing, "[t]he juvenile court may direct any and all reasonable orders to the parents . . . of the child who is the subject of any proceedings under this chapter as the court deems necessary and proper to carry this section. . . . That order may include a direction to participate in a counseling or education program. . . . The program in which a parent . . . is required to participate shall be designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300." (§ 362, subd. (d).) The juvenile court must order child welfare services for the minor and the minor's parents to facilitate reunification of the family. It has broad discretion to decide what will best serve and protect a child's interest and fashion the dispositional order in accord with this discretion. If the evidentiary record shows the orders are appropriate given the circumstances of the case, we will affirm the court's exercise of discretion. (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006–1007.)

As noted, the reunification plan and attendant dispositional orders must be tailored to an individual family's circumstances and designed to eliminate those conditions that led to the juvenile court's assertion of jurisdiction. (*In re Taylor J.* (2014) 223 Cal.App.4th 1446, 1451; *Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1501.) Here, the children were adjudged dependents of the juvenile court, based on findings that, inter alia, mother had an extensive history of substance abuse during her involvement with the dependency system over the past two decades which rendered her unable to protect the children, leaving them at substantial risk of suffering physical and emotional damage.

Father first asserts there is no evidence to support the court's order requiring him to participate in counseling to address "case issues to address co-dependency." We need not belabor this contention. The order is based on the court's understanding that the parents plan to remain or reconcile as a couple. The record contains evidence, credited by the court, that mother has a lengthy history of substance abuse. This evidence includes instances of intoxication while the children were in mother's care, including one particularly harrowing incident during which mother, while intoxicated, drove the wrong direction on the freeway with A.M. and Isaiah in the car. The parents want to reunite their family. Father has been intimately involved in the lives of mother and his children since his release from prison in

October 2011. The parents' relationship is volatile, and he has purportedly failed to identify the fact of mother's ongoing substance abuse and is allegedly unable to identify the triggers which lead to mother's relapses. The court could reasonably conclude that father should have been aware of mother's substance abuse, or that the volatility in their relationship contributed to his lack of awareness that mother was abusing substances, particularly in light of the fact that he periodically leaves the family home when he is upset with mother after an argument to stay with paternal grandmother.

Father maintains the order requiring him to participate in counseling cannot be supported because, as was the case in 2011 when the children were removed while he was incarcerated, he also was not living with mother in January 2013 at the time the children were most recently detained. The record does not support this broad assertion. Father told DCFS that he had been staying with his own mother for a few weeks before early January 2013. But he also said that between November 2012 and early January 2013, he sometimes left after an argument with mother, and would stay with paternal grandmother for only a couple days before returning to his family. Mother's most recent positive drug test was on December 26, 2012. The record does not definitively reflect that Father was absent at this time. When mother was arrested in 2011 for driving under the influence and the children were detained, father was incarcerated and could neither have known about or observed any signs of mother's substance abuse. (Opinion, pp. 2–3.) Things were quite different in December 2012. The juvenile court's order is premised largely on the fact that mother and father intend to remain together and want their family to reunite. The occasionally volatile nature of their relationship, and its impact on both mother's and father's responses to those episodes of conflict, could reasonably have caused the court to conclude that father needs to better understand the dynamics of mother's substance abuse and his response to and role in it.

Father's reliance on *In re Jasmin C*. (2003) 106 Cal.App.4th 177, is misplaced. In that case the juvenile court declared three siblings to be dependents based on a single incident of violent and abusive behavior by the father. No allegations were brought regarding any failure on her part to protect the children from the father. No consideration

9

was ever given to removing the children from the mother's custody, and the juvenile court sustained a section 300 petition in which mother was deemed nonoffending. (*Id*. at pp. 179–180.) Nonetheless, at disposition the court ordered the mother to participate in parenting classes. She appealed from that portion of the dispositional order, contending there was no evidence to support the court's order in that regard. The appellate court reversed, commenting that the "trial court imposed the parenting class condition on mother without making any findings or giving any explanation." (*Id*. at p. 181.) Observing that its "task . . . is to review the evidence to determine whether it is legally sufficient to support the trial court's implied conclusion that mother's attendance in parenting classes is reasonably necessary to avoid a repetition of father's emotional and physical abuse of the minors," the appellate court concluded that "no evidence, let alone substantial evidence, supports such a conclusion." (*Id*. at p. 180.)

The circumstances of this case are distinguishable. Unlike *In re Jasmin C.*, *supra*, 106 Cal.App.4th 177, in which there was no indication the parents planned to reconcile, here the parents plan to remain a couple. *In re Jasmin C.* also involved an isolated incident. This case presents the recurring issue of a parent's substance abuse and an ongoing relationship sometimes volatile enough to cause the parents to split up for a time. Further, to the extent the court found credible father's claim that he was ignorant of the signs of mother's substance abuse, it could reasonably have concluded that he would benefit from participation in counseling to address issues in his relationship with mother that impede his ability to detect her substance abuse, and therefore to protect the children.

Under the circumstances, we interpret the court's order requiring individual counseling as an intention to facilitate father's effort to achieve his stated goal of assisting mother on her journey toward sobriety, and in their joint effort to end the cycle of substance abuse that has kept their family apart. The order was amply supported by the record in this case.

## DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED.

JOHNSON, J.

We concur:

ROTHSCHILD, Acting P. J.

MILLER, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

11